(A. R. D. 63)

DUNLAP, ALPERS & MOTT ET AL. v. UNITED STATES

Entry No. 752294, etc.

## Second Division, Appellate Term

(Decided August 25, 1955)

*John D. Rode* for the appellants.

*Warren E. Burger,* Assistant Attorney General (*Henry J. O'Neill,* trial attorney), for the appellee.

Before LAWRENCE, RAO, and FORD, Judges

RAO, Judge: This is an application for the review of a decision and judgment rendered by a single judge sitting in reappraisement (32 Cust. Ct. 618, Reap. Dec. 8307) involving three importations of cigars from Cuba. Separate appeals for reappraisement having been filed for each importation, the same were consolidated for the purposes of trial.

The subject merchandise was entered in each instance on the basis of export value at the invoiced unit prices, plus cases and shipping, and was appraised at said invoiced unit prices net, plus a Cuban sales tax of 2.2 per centum (2.75 per centum less 20 per centum), plus case packing, upon the basis of foreign value. It is claimed here, as it was before the trial court, that the Cuban sales tax of 2.2 per

centum is not part of the foreign value of said merchandise; that the appraiser erred in so considering it; and that export and foreign values are the same as the entered values. It is not disputed that, if applicable, the amount of the tax was as fixed by the appraiser and that the tax is not assessed on export transactions. If the tax is properly included, foreign value would exceed export value by the amount thereof and, accordingly, would be higher.

The item of said tax is the only element in the appraiser's returns of values which has been challenged. Consequently, appellants rely, as they are entitled to do under well-settled principles of law, upon the presumed correctness of all other findings entering into the appraisement of the instant merchandise. *United States* v. *Freedman & Slater, Inc. (Household Utilities Mfg. Corp.)*, 25 C. C. P. A. (Customs) 112, T. D. 49241; *United States* v. *Fritzsche Bros.*, 35 C. C. P. A. (Customs) 60, C. A. D. 371; *United States* v. *Schroeder & Tremayne, Inc., James H. Rhodes & Co.*, 41 C. C. P. A. (Customs) 243, C. A. D. 558. Accordingly, the only issue before us is whether or not the Cuban sales tax is a part of foreign value, as that value is defined in section 402 (c) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, the provisions of which we quote below.[1]

More particularly, and in direct relation to the decision of the trial court, the questions here raised are as stated in the following three assignments of error filed by appellants:

3. In finding and holding that the Cuban Sales Tax of 2.2 per cent was properly part of the foreign value, as defined in Section 402 (c), Tariff Act of 1930. of the imported cigars.

5. In finding and holding that the Cuban Sales Tax of 2.2 per cent accrued when the manufacturer sold cigars for home consumption in Cuba.

6. In finding and holding that "if the tax accrued at the time the goods were sold, under the construction of value laid down in *United States* v. *Frederick S. Passavant, et al.*, 169 U. S. 16. 42 Law Ed. 644, it was part of the value of the goods when sold in the foreign market".

The record as made before the trial court was entirely documentary. It consisted of affidavits of individuals engaged in the manufacture and sale of cigars in Cuba, both for domestic consumption and for export, including affidavits of officials of the two companies which manufactured and exported the merchandise at bar; affidavits of attorneys engaged in the practice of law in Cuba; certified copies of reports of United States Treasury representatives; and copies of various Presidential decrees of Cuba, together with English translations thereof.

---

[1] FOREIGN VALUE.—The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale for home consumption to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

Decree No. 643, promulgated March 27, 1946, effective as of the 1st day of April 1946, is of particular concern here, since the merchandise at bar was exported during the months of April, May, and June 1946. This decree had for its fundamental purpose, as revealed by the introductory recitals thereto, the object of consolidating the various stages at which taxes on the sale, exchange, or assignment of goods were collected. We regard the following provisions of Decree No. 643, as herein pertinent:

WHEREAS: Taking into account that, in certain cases, the present collection system imposes the obligation to pay the tax only once, by the retailer, on mercantile transactions involving some products, and, specifically, the commodities that are subject to the Thirty-Five Million Loan taxes, the new system maintains the amount of the levy, as applicable to such cases, at the same 2.75% level, but with the additional advantage that the tax will be paid on the merchandise at the time of the purchase thereof by the retailer, and not upon being sold to the public as heretofore. [From the Preamble.]

## CHAPTER II

Article IV. This tax shall apply, at the rate of nine per cent, to the sale, exchange or assignment of such merchandise as may be produced in Cuba, except in the case of the merchandise specified in Article VIII hereof. It shall be computed on the value of the merchandise when the sale, exchange or assignment thereof is accomplished by the producer, after deducting twenty per cent (20%), this deduction having been estimated to cover the taxes and expenses accruing on domestic goods, which do not encumber imported commodities, in order that the latter as well as the former shall be equally taxed. The tax shall be paid by the producer at the Tax and Revenue Office of his domicile, within the first twenty-five days of the month following that in which the sale, exchange or assignment of the goods may be accomplished.

Article VII, II: The amount of the taxes established by virtue of Articles Third and Fourth hereof shall be limited to 2.75% in the cases enumerated hereinbelow, and shall be computed in the manner provided for in said Articles:

   *        *        *        *        *        *        *

b) The articles that are subject to the special Thirty-Five Million Loan taxes. In these cases, the producer or the importer thereof shall bill the retailer separately from the selling price, for the amount of the tax.

Article XIII. The consumption of the merchandise by the taxpayer, or the unjustifiable loss thereof while in his possession shall be understood, for the purposes of the payment of the tax, as equivalent to the sale, exchange or assignment thereof.

In the case of losses by disasters or crimes against insured interests, the payment of the tax may be deferred until indemnity therefor shall have been collected.

It appears from the record, directly or by implication, that, in the year 1904, the Government of Cuba negotiated a loan in the sum of thirty-five million dollars, known as the Speyer loan, and that taxes accruing upon certain commodities, among which tobacco and tobacco products were enumerated, were pledged to the redemption of such loan. In what manner these taxes were originally imposed,

we are not advised. It does appear, however, that, under the provisions of a law enacted on October 9, 1922, taxes on commodities covered by the Speyer loan took the form of retail sales taxes, payable by retailers on the basis of sales to consumers, and, hence, as observed by the trial court, not a part of foreign value within the definition thereof in the Tariff Act of 1930, *supra*.

This was the method by which sales of cigars were taxed until Presidential Decree No. 643, *supra*, was promulgated. Apparently still not redeemed, the so-called Speyer loan, and products covered thereby, were the subject of specific reference in said decree.

Much of the documentary evidence in the record before us is concerned with individual interpretations, both lay and legal, of the operation, scope, and effect of Presidential Decree No. 643, as originally promulgated and as amended by subsequent decrees. Those affiants who were without legal training spoke from years of experience in the business of manufacturing and selling tobacco products, including cigars, and the consequent necessity of full acquaintanceship with the provisions of the laws applicable to such activities. It having been shown by uncontroverted evidence that the particular laws of Cuba bearing upon the sales or the commodities which are before us have not been construed by the courts of that Republic, there can be no doubt that the evidence so offered was competent. *Slater* v. *Mexican National Railroad Company*, 194 U. S. 120; *In re International Mahogany Co.*, 147 Fed. 147; 20 Am. Jur. pp. 674–5; *United States* v. *F. S. Allenby & Co. et al.*, 20 C. C. P. A. (Customs) 80, T. D. 45703.

We are of opinion, however, in view of the lack of interpretation by the courts of the country of its enactment, that the law itself may be subjected to our own scrutiny and construction for the determination of its effect. In the absence of ambiguity or of references peculiar to the foreign forum, we may ourselves evaluate the language which the foreign Government has employed and, in so doing, reject any nonjudicial interpretations which may do violence to its plain intendment. 34 A. L. R. 1447, 1476.

As we read the provisions of Decree No. 643, with particular reference to products encompassed by the Thirty-Five Million Loan, we find that the tax is to be computed on the value of the merchandise when the sale, exchange, or assignment thereof is accomplished by the producer. The producer is required to invoice the amount of the tax separately from the selling price; the retailer is required to pay the tax; and the producer is required to remit the tax to the Government within the first 25 days of the month following that in which the sale, exchange, or assignment of the goods may be accomplished. Moreover, if the producer himself consumes the merchandise or suffers it to be unjustifiably lost while in his possession, he becomes liable for

the tax to the same extent as if a sale, exchange, or assignment of the merchandise had in fact been made.

Although the retailer is required to pay the tax, it does not appear from the phraseology of the law itself that the manufacturer or producer may withhold payment from the Government until such time as he actually receives payment from the purchaser. The requirement is that he shall make remittance "within the first twenty-five days of the month following that in which the sale, exchange or assignment of the goods may be accomplished."

It is clear to us that, under the provisions of this decree, the manufacturer, producer, or importer, as the case may be, is the taxpayer for all purposes. The Cuban Government looks to him for the payment of the tax if the merchandise passes from his hands, whether by sale, exchange, assignment, personal consumption, or unjustifiable loss. He may, and in fact is required to, pass the tax on to those who purchase from him, but it would appear that he is not excused from his obligation to remit the tax to his Government by reason of any default on the part of the purchaser.

This is by no means the interpretation placed upon the provisions of said decree by the various persons whose affidavits or reports are in the record before us. Moreover, as pointed out by the trial court, there is conflict in the evidence concerning when the Cuban sales tax accrues and when it is required to be paid. So, for example, there are statements in the record to the effect that the manufacturer acts as a collector for the Government and turns the tax over to the Government each month following *collection* (plaintiffs' collective exhibit 1, plaintiffs' exhibit 3, plaintiffs' collective exhibit 4, plaintiffs' exhibit 12); that the tax does not apply until after a sale has been consummated and delivery made (plaintiffs' exhibit 2); that the tax is paid by retailers on gross sales to consumers (plaintiffs' collective exhibit 4); that the manufacturer acts only as a withholder (defendant's collective exhibits 10 and 11, plaintiffs' exhibit 13, defendant's collective exhibit 15); and that the manufacturer or producer is not liable for the tax until and when a sale has been made to a retailer (plaintiffs' exhibits 12 and 13).

The trial court attributed the confusion in the record in this respect to the failure of the various affiants to distinguish "between the time of accrual of a tax, i. e., the time when the liability arises, and the time of payment of a tax, i. e., the time when payment under the liability is required." To this logical explanation we are inclined to add the suggestion of the probability that later modifications of Decree No. 643, or subsequent administrative interpretations thereof, clarified the status of the manufacturer as that of a withholder only.[2] However, insofar as the provisions of Decree No. 643 are concerned,

---

[2] See reference to Decree No. 5122 of 1949 in defendant's exhibit 15, which, however, is not in evidence.

we are of opinion that remittance to the Government became mandatory after a sale or other divestiture of the products in question, without regard to the fact of collection from the purchaser, even though ultimate liability for the payment of the tax may have rested with the retailer.

But whether we regard the manufacturer as the taxpayer, or merely as a withholder of a tax which the retailer had to pay, the fact remains that liability for the tax arose when a sale was made by the manufacturer. Counsel for appellants urges that because the tax *per se* was not included in the freely offered price of cigars in the principal markets of Cuba, but was required to be separately invoiced as an item which the retailer had to pay, the tax is not part of the value of the goods when sold in the foreign market. Though the evidence establishes that the prices quoted by the manufacturer of cigars in Cuba made no specific reference to the so-called Cuban sales tax, it is also true that the prevailing law rendered it unnecessary for him to do so. The existence of the tax underlay every transaction involving the sale of cigars in the ordinary course of trade. It was an implied but, nevertheless, essential element in every wholesale offering. The tax became a part of the price as completely as if it had been specifically included in every manufacturer's price quotations. This being so, the trial court quite properly relied upon the principle of the case of *United States* v. *Frederick S. Passavant et al.*, 169 U. S. 16, as expressed in the following excerpt:

> The certificate of facts states that the German duty is imposed on merchandise when "sold by the manufacturers thereof for consumption or sale in the markets of Germany;" and "is collected when the finished product goes into consumption in Germany." As the tax accrues when the manufacturer sells, his wholesale price includes it, and the purchaser who buys these cotton velvets in wholesale quantities in the German markets pays a price covering the tax, and that is the price for the merchandise when bought and sold in those markets.

Counsel for appellants argues that the *Passavant* case, *supra*, is distinguishable from the instant one by virtue of a difference both in the facts and in the language of the applicable statute. The *Passavant* case arose under the Customs Administrative Act of June 10, 1890, wherein it was provided that duty should be assessed "* * * upon the actual market value or wholesale price of such merchandise as bought and sold in usual wholesale quantities." The present act provides for the assessment of duty on "the market value or the price * * * at which such or similar merchandise is freely offered for sale." The essential difference between the two acts, as we construe them, is that the earlier one selected as the criterion for determining market value sales already negotiated, whereas the present law rests upon offers of sale. But this is a distinction without a difference, so far as the case at bar is concerned, in view of our conclusion that the manufacturers'

quoted price was to all intents and purposes always, albeit impliedly, augmented by the amount of the tax which was fixed by law.

Neither do we agree with appellants' contention that the Supreme Court in the *Passavant* case, *supra*, was not called upon to determine whether the amount of the tax there involved was actually included as part of the price of the goods. The question certified to that Court was "was the 'German duty' lawfully included by the appraiser in his estimate of dutiable value?" In finding the market value or price at which such merchandise was bought and sold in usual wholesale quantities, the Court was required to answer this question, and did so by stating:

> * * * As the tax accrues when the manufacturer sells, his wholesale price includes it, and the purchaser who buys these cotton velvets in wholesale quantities in the German markets pays a price covering the tax, and that is the price for the merchandise when bought and sold in those markets.

Subsequent applications of the principle invoked in the *Passavant* case, *supra*, illustrate most compellingly that the changes in language in the valuation statutes in the years since the act of 1890 became a law have not effected any different result.

The case of *Hugo Reisinger (Inc.) et al.* v. *United States*, 20 C. C. P. A. (Customs) 67, T. D. 45683, arose under the Tariff Act of 1922, wherein the definition of foreign value is almost identical with that in the present law. There, it appeared that the German Government levied a tax upon illuminants and illuminating materials destined for consumption in Germany. The law under which the tax was levied provided in substance that whoever introduced illuminants into the open market was to be regarded as the tax debtor; that the taxable value was the price invoiced by the tax debtor to his customer; and that the tax should be separately invoiced. In concluding that this tax was a part of foreign value, as defined in said Tariff Act of 1922, the court stated:

> The tax is paid by some one upon the merchandise sold in the German market and becomes due and payable upon the sale being made. So far as the German Government is concerned, its collection is enforced at the source of that particular sale which "introduces the merchandise into the open market." The seller is liable, and the tax is actually collected by the Government from such seller, who in turn, in the ordinary course of trade, collects it from the purchaser. · It is included—must be included—upon the invoice made by the seller to the purchaser. Even if the tax debtor gives the merchandise itself away, it is still subject to have applied to it "as assessable value * * * the price for similar illuminants," under authorized regulations, and said tax debtor is liable for the tax so assessed.
>
> *         *         *         *         ,    *         *         *
>
> The fact that the tax was required to be separately listed upon the invoice from the tax debtor to the purchaser does not change the law as to its being a tax.
>
> *         *         *         *         *         · *         *

Like the court below, we are unable to distinguish this case in principle from the doctrine announced by the Supreme Court of the United States in the *Passavant* case, *supra*.

We are not able to observe any substantial difference between the German law involved in the *Reisinger* case, *supra*, and the Cuban law which governs here. Both imposed a tax on the first sale of the subject merchandise; both looked to the individual who first introduced such merchandise into the open market for remittance of the tax; both contained provisions for passing the tax on to the purchaser; both predicated the tax upon the value of the merchandise at the time of the initial sale; and both provided for separate invoicing of the tax. That the German law specifically characterized the first seller as the tax debtor, whereas the Cuban decree did not, does not alter the fact that, in both instances, the obligation to pay the tax to the Government rested with persons whose relationship to sales of the taxed merchandise was the same.

Counsel for appellants urges that a parallel exists between the instant case and the case of *United States* v. *Wm. S. Pitcairn Corp.*, 33 C. C. P. A. (Customs) 183, C. A. D. 334, for the reason, as alleged, that the tax here applies "*not on sales to all purchasers* but only on sales to retailers, a restricted or limited class of buyers." [Italics quoted.] The record before us does not support the inference that sales of the taxed merchandise were restricted to retailers either by design of the sellers or under the prevailing law. It was a matter of practice or custom, rather than restriction, which made retailers the only class of purchasers who regularly bought such or similar merchandise in the usual wholesale quantities and in the ordinary course of trade. Such other sales as were made by the manufacturers or producers were shown to be accommodation sales to friends and appear to have been made at retail prices. Since there is no evidence that sales were restricted to any given class of buyers, there is no factual basis for the argument that such or similar merchandise was not freely offered for sale to all purchasers.

We agree with the trial judge that the following statement from *United States* v. *Wm. S. Pitcairn Corp.*, *supra*, is here controlling:

The difference between the facts in the *Passavant* case and those in the case at bar is that in that case the tax accrued when the manufacturer sold, that is, when the merchandise was introduced into the open market, and was always a part of the actual market value and was included in the price at which the merchandise was sold to all purchasers for home consumption, whereas, in the instant case, the tax does not accrue when the merchandise is sold by registered manufacturers to registered wholesalers or by registered wholesalers or dealers to other registered wholesalers or dealers, but accrues only when the merchandise is sold to unregistered dealers or to the consuming public.

Like the situation which obtained in the *Passavant* and *Reisinger* cases, *supra*, as distinguished from that in said *Pitcairn* case, the tax

at bar accrued when the manufacturer or producer sold. By virtue of the operation and effect of existing law, it became a part of the price at which cigars were freely offered for sale for home consumption in the usual wholesale quantities and in the ordinary course of trade. Accordingly, it is properly to be regarded as an element entering into the foreign value of such or similar merchandise, as that value is defined in section 402 (c) of the Tariff Act of 1930, as amended, *supra*. By reason of the foregoing considerations, the judgment of the trial court is affirmed upon the following findings of fact and conclusions of law:

1. That the merchandise covered by the instant application for review consists of cigars exported from Cuba.

2. That said merchandise was entered on the basis of export value at the invoiced unit prices, plus cases and shipping, and was appraised at said invoiced unit prices net, plus a Cuban sales tax of 2.2 per centum (2.75 per centum less 20 per centum), plus case packing, upon the basis of foreign value.

3. That the sole question herein presented is whether or not said sales tax constituted a part of the foreign value of said merchandise.

4. That by operation of Presidential Decree No. 643, having the force and effect of law, said tax accrued when a sale, exchange, or assignment of such merchandise was accomplished by the manufacturer or producer and, hence, by implication, became a part of the price at which such or similar merchandise was freely offered for sale for home consumption to all purchasers in the principal markets of Cuba, in the usual wholesale quantities and in the ordinary course of trade.

5. That sales of the taxed merchandise were not restricted either by design of the sellers or under the prevailing law to any class of purchasers, but, by practice and custom, retailers constituted the only class of purchasers who regularly bought such or similar merchandise in the usual wholesale quantities and in the ordinary course of trade.

We, therefore, conclude:

1. That the Cuban sales tax of 2.2 per centum (2.75 per centum less 20 per centum) is properly part of the foreign value of the instant merchandise within the definition of such value in section 402 (c) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938.

2. That the proper basis for the determination of the value of the instant merchandise is foreign value as so defined.

3. That such foreign value is in each instance the value returned by the appraiser, and

4. That the judgment of the trial court should be affirmed.

Judgment will be entered accordingly.